IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GMAC REAL ESTATE, LLC, | ) | **FILED: MAY 30, 2008** |
| | ) | **08CV3141 DAJ** |
| Plaintiff, | ) | **JUDGE LEINENWEBER** |
| | ) | **MAGISTRATE JUDGE NOLAN** |
| vs. | ) | No. |
| | ) | |
| GARROW REAL ESTATE, LLC, k/n/a | ) | |
| SUMMERLAND REALTY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR CONFIRMATION OF ARBITRATION AWARD AND JUDGMENT

Plaintiff and Claimant in the underlying arbitration, GMAC Real Estate, LLC ("GMAC") by its attorney Eric R. Lifvendahl, moves this Court to confirm the arbitration award entered on May 27, 2008 by the American Arbitration Association ("AAA") and enter judgment on behalf of GMAC pursuant to Federal Arbitration Act, §9.  In support of its motion, GMAC states as follows:

1.     GMAC and Defendant (also the named Respondent in the arbitration) Garrow Real Estate, LLC k/n/a Summerland Realty, LLC ("Garrow LLC") entered into a Franchise Agreement effective June 1, 2006.  A copy of the Franchise Agreement is attached hereto as Exhibit A.

2.     Pursuant to Section 23 of the Franchise Agreement, the parties agreed that any dispute would be resolved by arbitration before the AAA in Chicago.  (Ex. A, §23B, pp. 26-27). The parties also agreed that the arbitration would be governed by the Federal Arbitration Act and any judgment upon the arbitrator's award may be entered in any court of competent jurisdiction. (*Id.*)

3.    Following a dispute over the Franchise Agreement GMAC filed an Arbitration Demand with AAA.  (A copy of the Demand is attached as Exhibit B).  As stated in the Demand, GMAC's principal place of business is Illinois.

4.    On April 11, 2008, an arbitration hearing in Case No. 51 115 Y01566 07 was held in Chicago before the arbitrator David Kabat, Esq.

5.    On May 27, 2008, arbitrator Kabat issued an Award of Arbitrator ("Award").  (A copy of the Award is attached as Exhibit C).

6.    As states in the Award, defendant Garrow LLC is ordered to pay GMAC a total of $2,386,435.30 excluding arbitration filing costs and attorney's fees.

7.    The Award also granted GMAC $17,580.48 in attorney's fees and $14,715.97 in arbitration costs and fees.

8.    GMAC requests this Court enter an Order confirming the arbitration Award and entering judgment on behalf of GMAC.  Attached hereto is a draft Proposed Order Confirming the Arbitration Award and Judgment on behalf of GMAC.

WHEREFORE, Plaintiff GMAC Real Estate, LLC respectfully requests the Court enter an Order confirming the arbitration Award entered by arbitrator David Kabat on May 27, 2008 and entering judgment against Defendant.

Respectfully submitted,

GMAC Real Estate, LLC, Plaintiff


By:___/s/ Eric R. Lifvendahl_____
        One of its Attorneys

Eric R. Lifvendahl
Williams Montgomery & John Ltd.
20 North Wacker Drive

Suite 2100
Chicago, IL 60606
(312) 442-3200

Document #: 776000

08CV3141    DAJ
JUDGE LEINENWEBER
MAGISTRATE JUDGE NOLAN

# EXHIBIT A

# GMAC REAL ESTATE, LLC

## REAL ESTATE FRANCHISE AGREEMENT


EXHIBIT
A

## TABLE OF CONTENTS

Page

1. THE FRANCHISE. ...................................................................................1

2. RELATIONSHIP OF THE PARTIES. .....................................................1

3. THE MARKS. ...........................................................................................2

4. MATERIALS. ...........................................................................................4

5. TRAINING. ..............................................................................................5

6. GRANT OF THE LICENSE. ....................................................................6

7. CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE. .................................................................................7

8. NO CONFLICTING LICENSE / INTEREST. .........................................7

9. GROSS COMMISSION INCOME AND FEES / REAL PROPERTY. ....7

10. FEES. ........................................................................................................8

11. PAYMENT OF FEES/REPORTING. .......................................................9

12. LATE PAYMENT. ..................................................................................10

13. VERIFICATION RIGHTS. .....................................................................11

14. ADVERTISING FUND. .........................................................................11

15. REFERRALS. ..........................................................................................13

16. PREMIER SERVICE®; BUSINESS PLANNING; PERFORMANCE STANDARDS. .........................................................................................15

17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL. ...........16

18. TERMINATION; DEFAULT; CROSS-DEFAULT. ..............................19

19. OBLIGATIONS UPON TERMINATION. ..............................................21

20. REPRESENTATIONS AND WARRANTIES. ........................................23

21. ENTIRE AGREEMENT. .........................................................................24

22. INDEMNIFICATION AND INSURANCE. ............................................24

23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS. ........................................26

24. MODIFICATION OF AGREEMENT. .....................................................27

25. SEVERABILITY. ....................................................................................27

26. NON-WAIVER. .......................................................................................27

27. NOTICES; FACSIMILE AND ELECTRONIC MAIL. ..........................28

28.   TERM AND RENEWAL. ............................................................................28
29.   EFFECTIVE DATE. ...............................................................................29
30.   PAST DUE FEES/FRANCHISE DEVELOPMENT COSTS LOAN ...........................28
31.   LIMITATION OF DAMAGES/RELEASE. ..........................................................29
32.   CONFIDENTIALITY OF AGREEMENT. ..........................................................31

**EXHIBITS**

Endorsement of Principals / Ownership Interest Holders
A    -    Royalty / Advertising Fees
B    -    Franchise Development Costs Note
C    -    Term Loan Note
D    -    Loan & Security Agreement
E    -    Personal Guaranty
F    -    Pledge Agreement

# REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("**GMAC Real Estate**"); and

| | |
|---|---|
| Garrow Real Estate, LLC<br>Exact name under which real estate license is held ("**Strategic-Partner**"), whose principal place of business is located at 8210 S. Saginaw, Suite 2, Grand Blanc, MI 48439<br>FEDERAL ID#_____ | Trade Name:_____<br>Garrow GMAC Real Estate<br><br>(initial selection of and any modification of Trade Name requires prior written approval of GMAC Real Estate. However, Strategic-Partner is solely responsible for ensuring that its choice of Trade Name complies with applicable law and does not infringe on the rights of any third parties.) |

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "**Franchise**") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.C.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2. RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage. Neither this Real Estate Franchise Agreement (this "**Agreement**"), nor the use of the term "Strategic-

Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties. The GMAC Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate. Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3. THE MARKS.

A. **Ownership and Modification of the Marks.** GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the "Marks"). Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement. A copy of the current GMAC Real Estate Identity Standards Manual, as revised by GMAC Real Estate from time to time (the **"Identity Standards Manual"**) may be accessed by Strategic-Partner at gmacmembers.com or at such alternative site as GMAC Real Estate may designate in the future. Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.D.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks. GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required. All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate. All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner. The term "Marks" shall include any marks developed and/or registered in the future.

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt

additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner for any goodwill related to the discontinued or modified Mark. Any provision of this Agreement to the contrary notwithstanding, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words containing the designation "GMAC", then GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

B. **Use of Marks.** To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site (as described in Section 6) during the term of this Agreement, and will not use the Marks except in conjunction with permanent real estate sales offices approved by GMAC Real Estate. The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate, Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

The Marks may be used only in the form and style authorized by GMAC Real Estate, as outlined from time to time in this Agreement and its manuals (including the Identity Standards Manual) and other communications (collectively, the "Trademark Standards"). Any departure from the Trademark Standards or any use of the Marks on printed materials not outlined in the Trademark Standards must be approved in advance, in writing, by GMAC Real Estate.

If Strategic-Partner is an entity, it shall not use the GMAC Real Estate name or any other Mark as part of its legal name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. Throughout the Term of this Agreement, Strategic-Partner will operate exclusively under the Trade Name indicated at the beginning of this Agreement with regard to all advertising, promotions and communications. In no event may Strategic-Partner use the names "GMAC" or "GMAC Real Estate" alone or in any abbreviated form when identifying Strategic-Partner and/or its operations at the Licensed Site. Strategic-Partner may use the GMAC Real Estate name (but not "GMAC" alone or any other Mark) as part of an Internet (or other computer network) domain name, provided that (i) such use complies with the Trademark Standards; (ii) prior written approval of the domain name is obtained from GMAC Real Estate; and (iii) upon termination of this Agreement for any reason, Strategic-Partner will comply with the terms of Section 19.A. (1) with regard to terminating its use of the GMAC Real Estate name as part of its domain name.

GMAC Real Estate reserves the right to approve any and all public use of the Marks, other than on materials produced by GMAC Real Estate for use by its strategic-partners. Use of

the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate. Strategic-Partner will not enter into any agreement providing for the publication or display of any advertisement (including any telephone directory listing) incorporating the Marks, which agreement would result in the publication or display of such advertisement beyond the expiration of the Term of this Agreement.

GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

## 4. MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials), trade secrets, recruiting techniques and other methods and "know how" developed by GMAC Real Estate as part of the Franchise (collectively, the **"Confidential Materials"**)are confidential and are restricted to use by Strategic-Partner in its own business during the Term of this Agreement. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or disclose, license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, any Confidential Materials, or adapt and use, or permit any of its sales associates or employees to adapt and use, any such Confidential Materials on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate. Strategic-Partner's obligation to maintain the confidentiality of the Confidential Materials will survive the termination of this Agreement.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the **"Specifications"**) set forth in the Trademark Standards from time to time. No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such unapproved departure shall be considered a Default of this Agreement. Each of Strategic-Partner's Licensed Sites shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date. If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards and building and yard signs) disseminated to the public and used in Strategic-Partner's business shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner. Pre-approved advertising and marketing templates also are available to Strategic-Partner at gmacmembers.com.

## 5.  TRAINING.

A. **Getting Connected Session.**  For New Strategic-Partners:  GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate.  Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the first available GCS after execution of this Agreement. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners:  Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate.  The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction.  Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

B. **Accountability in Management.**  For both new and renewing Strategic-Partners, within 24 months following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete Accountability in Management ("AIM") training. AIM is a week-long management training program currently provided by a third-party vendor. Strategic-Partner must pay the AIM training registration fee for each attendee.

C. **Great Recruiting – Our Way.**  For both new and renewing Strategic-Partners, within 24 months following the Effective Date at least one key management representative of Strategic-Partner must satisfactorily complete Great Recruiting – Our Way ("GROW") training. GROW is a week-long management training program focusing on recruiting and retention, currently provided by a third-party vendor.  Strategic-Partner must pay the training registration fee for each attendee.

D. **Premier Service®.**  Strategic-Partner and each of its managers and sales associates must satisfactorily complete Premier Service training within six (6) months following the later to occur of (i) the Effective Date or (ii) such individual first becoming associated with Strategic-Partner.  Strategic-Partner must pay the registration fee for each attendee.

E. **Annual Business Conference/IMPACT!**   At least one key management representative of Strategic-Partner must attend either the GMAC Real Estate Annual Business Conference or an IMPACT! meeting each year during the Term.  Strategic-Partner must pay the registration fee for each attendee.

F. **Costs.** Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending the training programs described in Sections A. through E. above and all other training programs.

## 6. GRANT OF THE LICENSE.

A. **Current Offices.** Strategic-Partner represents that it presently operates, or will by the Effective Date operate, office(s) at the following location(s):

| | |
|---|---|
| Location | 8210 S. Saginaw, Suite 2, Grand Blanc, MI 48439 |
| Location | 7188 N. Main, Clarkston, MI 48326 |
| Location | 71 Walnut, Rochester, MI 48307 |
| Location | G-6122 W. Pierson, Flushing, MI 48433 |
| Location | 3250 University, Suite 105, Auburn Hills, MI 48326 |
| Location | 1133 S. State, Davison, MI 48423 |
| Location | 4111 Vienna Road, Clio, MI 48420 |
| Location | 1200 S. Belsay Road, Burton, MI 48509 |
| Location | 18040 Silver Parkway, Fenton, MI 48430 |

GMAC Real Estate grants to Strategic-Partner a license to establish and/or operate a real estate brokerage office displaying the Marks at the existing office location(s) set forth above (each, a "**Licensed Site**" and, collectively, the "**Licensed Sites**"). Although the license granted to Strategic-Partner is non-exclusive and similar licenses may be granted to others within Strategic-Partner's market area, GMAC Real Estate shall not grant to another strategic-partner a license to use the Marks at an office located at the Licensed Site(s).

B. **Additional Offices.** If Strategic-Partner desires to expand its real estate brokerage business, by opening an additional office or otherwise, it shall apply to GMAC Real Estate for approval to do so, by submitting a written application at least ninety (90) days prior to the planned date for opening. Approval of such expansion shall be granted, withheld or conditioned within GMAC Real Estate's sole discretion and, if granted, shall be in writing. Without limiting the generality of the foregoing, if Strategic-Partner submits an application for an office expansion within the last three (3) years of the Term, GMAC Real Estate reserves the right to withhold approval or to condition it on Strategic-Partner entering into a new franchise agreement, on the form then being offered by GMAC Real Estate, for a term of not less than five (5) years, covering all of Strategic-Partner's offices.

If Strategic-Partner's application is approved, Strategic-Partner and GMAC Real Estate will (i) execute an amendment to this Agreement to add the new office as a Licensed Site, or (ii) if the location of the new office is in a different market area than the Licensed Site(s) covered by this Agreement, enter into a separate agreement, on the form then being offered by GMAC Real Estate, with regard to the new office, or (iii) if required by GMAC Real Estate in accordance with the first paragraph of this subsection 6.B., execute a new agreement, on the form then being offered by GMAC Real Estate, with regard to all of Strategic-Partner's offices (e.g. the Licensed Site(s) and the new office). Strategic-Partner's application must be accompanied by payment of

the applicable Joining Fee for the additional franchise. If the office expansion is not approved by GMAC Real Estate, the Joining Fee will be refunded.

C. **Sublicensing Prohibited.** Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

## 7. CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE.

Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable. GMAC Real Estate reserves the right: (i) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site(s), including areas adjacent to, or in proximity with, the Licensed Site(s); (ii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site(s) under the Marks or other marks; and (iii) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels of distribution, selling or leasing similar products or services under a different mark. Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution: (x) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (y) offering dissimilar products or services under the Marks.

## 8. NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, "**Owners**"), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; or (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate, provided that an independent commercial real estate business established in accordance with the Commercial Exclusion Requirements of Section 9(b) will not be deemed to violate this provision. The provisions of this Section 8: (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate.

## 9. GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.

A. Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

B.  "**Gross Commission Income**" ("**GCI**") includes all commissions and fees received by Strategic-Partner from the marketing and/or sale, lease, transfer or other disposition (including mergers and similar transactions) (each a "**Disposition**") of Real Property (as defined below), including (i) any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, and (ii) all commissions and fees received by Strategic-Partner from property management, the Disposition of commercial real estate or the non-residential portion of farm properties and any other brokerage or similar activity, (collectively, "**Commercial Activities**"), **unless**, with respect to this subsection (ii), Strategic-Partner conducts such Commercial Activities through a separate legal entity (with a Federal I.D. number different from Strategic-Partner's), which entity maintains its own office location and telephone number and does not use the Marks (collectively, the "**Commercial Exclusion Requirements**"), in which event the commissions and fees derived from Commercial Activities may be excluded from GCI.

Specifically:  (X) GCI includes all referral-related income received by Strategic-Partner <u>unless</u> it has paid GMAC Real Estate a Referral Fee in connection with the same pursuant to Section 15, selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include desk rental fees received from sales agents; fees for Buyer Price Opinions provided they do not exceed $100 per opinion or account for more than five percent (5%) of Strategic-Partner's total GCI annually; or referral income received by Strategic-Partner as the "Originating Strategic-Partner" for which Strategic-Partner has paid GMAC Real Estate a Referral Fee in accordance with Section 15 of this Agreement; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

C.  "**Real Property**" includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

**10. FEES.**

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

A.  <u>Joining Fee</u>.  Not Applicable For any additional offices opened by Strategic-Partner pursuant to the terms of Section 6.B. following the Effective Date, a Joining Fee in an amount equal to $20,000 for Strategic-Partner's first Licensed Site within a particular market area, and $7,500 per Licensed Site for each of Strategic Partner's additional Licensed Site(s) located within the same market area, as determined by GMAC Real Estate.

B.  <u>Royalty Fees</u>.  In accordance with the provisions of <u>Exhibit A</u>, attached.

C.  <u>Referral Office Fee</u>.  A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on

each subsequent anniversary date thereof) for each Licensed Site, provided, however that the total Referral Office Fee amount paid by Strategic-Partner in any given year shall not exceed $3,528.00. Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

    D. **Referral Fee**.  A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

    E. **Advertising Fee**.  In accordance with the provisions of <u>Exhibit A</u>, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement

    F. **Training Fees**.  In accordance with the provisions of Section 5 of this Agreement.

    G. **Returned Check/Rejected EFT Fee**.   Strategic-Partner will be charged a fee of $50 for each check returned or electronic funds transfer (EFT) rejected due to insufficient funds or due to Strategic-Partner's issuance of a stop-payment order.  Said fee will be in addition to, and not in lieu of, any other remedies available to GMAC Real Estate which may arise due to late or insufficient payments or failure to pay by Strategic-Partner.

## 11. PAYMENT OF FEES/REPORTING.

    A. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as required from time to time by GMAC Real Estate. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future.

    B. GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards – as defined in Exhibit A, if applicable) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an **"Affiliate"** of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation).  Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system (**"BRS"**) approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system (**"EFT"**) approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use an approved interface between the BRS approved by GMAC Real Estate and Strategic-Partner's existing software, including all required hardware and software (the "Interface") and/or EFT, including all required hardware and software.  Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to

Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents. In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate. By way of clarification, Strategic-Partner shall be permitted to continue using its existing reporting system, provided it installs an interface between its existing system, and GMAC Real Estate's transaction reporting system, upon notification from GMAC Real Estate in accordance with the conditions stipulated above. In the event Strategic-Partner is required to develop and implement the Interface in accordance with this Section, GMAC Real Estate shall reimburse Strategic-Partner for the actual, documented out-of-pocket cost, up to $2,500.00, for the development of the Interface.

C. Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

**12. LATE PAYMENT.**

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; **"prime"** is defined as the interest rate published in The Wall Street Journal (the **"WSJ"**) in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, **"prime"** shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate

Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A, if applicable).  In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13. VERIFICATION RIGHTS.

A.      No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate.  Strategic-Partner shall prepare and maintain its accounting books and records in accordance with generally accepted accounting principles consistently applied. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations.

B.      During the Term, and for three years after the expiration of the Term or earlier termination of this Agreement, Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages.  If it is determined that Strategic-Partner has reported to GMAC Real Estate any fees due under this Agreement which are 3% or more lower than the fees actually due hereunder, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. If Strategic-Partner wishes to dispute the results of the audit, it may do so by providing GMAC Real Estate, no later than ninety (90) days following Strategic-Partner's receipt of the audit results, with written notice of the dispute, which notice must be accompanied by evidence, reasonably satisfactory to GMAC Real Estate, supporting Strategic-Partner's position with regard to the disputed items. If Strategic-Partner fails to provide written notice of a dispute as provided herein within such 90 day period, Strategic-Partner will be deemed to have waived its right to dispute the audit results.

C.      GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time.  GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

## 14. ADVERTISING FUND.

A. Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the "**Advertising Fund**" or the "**Fund**") for the purpose of providing marketing and advertising relative to the Marks.  The Advertising Fund shall consist of monies paid to

GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, "**Programs**"); (B) host and maintain a national consumer website, (C) produce and distribute marketing-related communications to the franchise network; and (D) present and promote a national business conference.

B. The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

C. GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

D. In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and costs) to the Advertising Fund. GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

E. Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate. On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request. Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

F. GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be

inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

G. GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

H. GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement. In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

A. With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner, as the "**Originating Strategic-Partner**", shall make each such referral directly to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "**Approved Alternative Broker**"). The broker receiving such referral, whether another GMAC Real Estate strategic-partner or an Approved Alternative Broker, is hereinafter referred to as the "**Authorized Destination Broker**". The Originating Strategic-Partner must register the transaction with GMAC Real Estate. To register a referral, Originating Strategic-Partner must submit (via fax, e-mail or overnight courier) the required referral form, including complete contact information as provided, at the time that the referral is accepted by the Authorized Destination Broker, and in no event later than one business day following such acceptance. This referral form is required regardless of whether the Authorized Destination Broker is a strategic-partner of GMAC Real Estate or is an Approved Alternative Broker. Strategic-Partner shall pay referral fees and royalties as set forth below.

Notwithstanding anything in the above paragraph to the contrary, upon receipt of written notice from GMAC Real Estate to begin doing so, Strategic-Partner agrees, when acting in the capacity of the Originating Strategic-Partner, to place all referrals using a web-based system designated by GMAC Real Estate.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner as the Authorized Destination Broker will, within 10 days after it receives any GCI from that referred transaction, pay to the Originating Strategic-Partner a fee of at least 25% (the exact percentage will be as mutually determined by the brokers involved, provided it is not less than 25%) of the GCI that Strategic-Partner earned from the referred transaction. Strategic-Partner then will pay Royalty Fees based on the net GCI from the referred transaction. (By way of example, if Strategic-Partner, as the Authorized Destination Broker, earned $10,000 in GCI on a referred transaction, it would be obligated to pay (i) to the Originating Strategic-Partner a fee of $2,500 (assuming a 25% fee was agreed upon by the brokers); and (ii) to GMAC Real Estate, Royalty Fees in accordance with the fee schedule attached to this Agreement).

Likewise, if Strategic-Partner, as the Originating Strategic-Partner, refers an outgoing transaction to an Authorized Destination Broker, the Authorized Destination Broker will pay to Strategic-Partner a fee of at least 25% (the exact percentage will be as mutually determined by the brokers involved, provided it is not less than 25%) of the GCI it earned from the referred transaction. In that instance, Strategic-Partner as the Originating Strategic-Partner, then will pay GMAC Real Estate a fee (a "**Referral Fee**") equal to 10% of the amount that Strategic-Partner received from the Authorized Destination Broker. (By way of example, if an Authorized Destination Broker earned $10,000 in GCI on transaction for which Strategic-Partner was the Originating Strategic-Partner, Strategic-Partner (i) would be entitled to receive from the Authorized Destination Broker a fee of $2,500 (assuming a 25% fee was agreed upon by the brokers); and, in turn, (ii) would be obligated to pay to GMAC Real Estate, a Referral Fee of $250).

Notwithstanding anything in this subsection 15.A. to the contrary, GMAC Real Estate reserves the right, from time to time, to increase the minimum percentage to be paid by Authorized Destination Brokers to GMAC Real Estate strategic-partners in connection with referrals.

B. GMAC Real Estate strongly encourages strategic-partners to make referrals to Authorized Destination Brokers. Should Strategic-Partner nonetheless wish to make a referral to a broker that is not an Authorized Destination Broker (an "**Unauthorized Broker**"), it may do so, provided, however, that Strategic-Partner (a) still must register the referral in accordance with the requirements of subsection 15.A. above; (b) may not agree to receive a fee from the Unauthorized Broker of less than 25% of the GCI earned from the transaction (said minimum to be subject to increase by GMAC Real Estate from time to time) and (c) Strategic-Partner will be obligated to pay GMAC Real Estate a Referral Fee in an amount equal to 15% of the amount that Strategic-Partner receives from the Unauthorized Broker in connection with the referred transaction. (By way of example, if an Unauthorized Broker earned $10,000 in GCI on transaction for which Strategic-Partner was the Originating Strategic-Partner, Strategic-Partner (i) would be entitled to receive from the Unauthorized Broker a fee of $2,500 (assuming a 25% fee was agreed upon by the brokers); and, in turn, (ii) would be obligated to pay to GMAC Real Estate, a Referral Fee of $375).

C. In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

D. Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PREMIER SERVICE®; BUSINESS PLANNING; PERFORMANCE STANDARDS.

A.  Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Of primary importance is Strategic-Partner's full engagement in Premier Service®, GMAC Real Estate's proprietary service delivery program that provides a systematic and measurable way to conduct business. In addition to satisfying the Premier Service training requirements described in Section 5.C. above, Strategic-Partner agrees to participate in the Premier Service survey process by  enrolling its Licensed Site(s) and sales agents, requesting every buyer and seller represented by Strategic-Partner to complete a  customer satisfaction survey (in the form required by GMAC Real Estate) upon completion of a transaction, and then submitting the transaction data as directed by GMAC Real Estate. Strategic-Partner is responsible to pay a one-time registration fee for each of the Licensed-Site(s) and a fee for each survey sent to a buyer or seller. Furthermore, Strategic-Partner agrees that it will offer Full-Service Brokerage (as defined below) to every one of its customers. In addition, Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

For purposes of this Agreement, "Full-Service Brokerage" means providing the following minimal level of service:

Strategic-Partner must:

(1)    accept delivery of and present to the customer all offers and counteroffers to buy, sell or lease the customer's property or the property the customer seeks to purchase or lease;

(2)    assist the customer in developing, communicating, negotiating, and presenting offers, counteroffers and notices that relate to the offers and counteroffers until a lease or purchase agreement is signed and all contingencies are satisfied or waived; and

(3)    answer the customer's questions relating to the offers, counteroffers, notices and contingencies.

B.     Strategic-Partner, with the assistance of a GMAC Real Estate business development consultant, and using such financial modeling tools as may be designated by GMAC Real Estate from time to time, agrees to prepare and submit annually (no later than 90 days following each anniversary of the Effective Date) to GMAC Real Estate a business plan in a form acceptable to GMAC Real Estate.

C.     Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date (or, if the review period is for the first year after the Effective Date, the last year prior to the Effective Date), or (b) GCI attained during the 1-year period prior to the 1-year period being

reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement. Notwithstanding the provisions of this subparagraph (b), if the Market Area (as later defined) serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the total sales volume, by dollar, of residential property sold during the year being reviewed is less than 90% of the total sales volume, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the total sales volume of the year being reviewed is 90% of the total sales volume of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%). "**Market Area**" shall be the area serviced by those multiple listing services (the "**MLS**") in which Strategic-Partner filed 80% or more of its listings during the prior 12-month period;; total sales volume shall be as reflected by the records of the MLS.

## 17. ASSIGNMENT; OWNERSHIP; TRANSFERS; RIGHT OF FIRST REFUSAL.

A. **Assignment by GMAC Real Estate.** GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

B. **Transfer of Agreement, Assets by Strategic-Partner.** Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Therefore, Strategic-Partner agrees that it shall not, without the prior written consent of GMAC Real Estate, Transfer (as defined in Section 17.E. below) this Agreement, any interest in its licensed business, or all or substantially all of its assets. GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement provided, however that any Transfer between/among Strategic-Partner and the spouse and/or children of an Owner shall not be unreasonably withheld. Additionally, any such consent will be conditioned upon the following: (1) the Transfer of this Agreement may occur only in connection with the Transfer of the entire business conducted pursuant to this Agreement; (2) the transferee has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement; (3) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (4) agreement by the transferee (or a principal of the transferee) to attend required training; (5) a copy of all relevant Transfer documentation is delivered to GMAC Real Estate; (6) at least 30-days prior written notice is given to GMAC Real Estate; (7) if the Transfer occurs in the last five (5) years of the Term of this Agreement, the transferee shall be required to execute a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement; and (8) if the Transfer occurs in the first five (5) years following the Effective Date of this Agreement, the transferee shall be permitted to assume this Agreement for the remainder of the Term. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to

this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the Transfer.

C. **Ownership**. Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity, Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed). Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

( )      corporation:  organized under the laws of the State or Commonwealth of
_____

(X)      limited liability company:  organized under the laws of the State or Commonwealth of Michigan _____

( )      partnership (indicate type):  organized under the laws of the State or Commonwealth of _____

Owners:

Robert Garrow                                         100%
(Ownership interest holders listed)

Robert Garrow
(Broker of Record)

D. **Transfer of Ownership Interests in Strategic-Partner**. The written consent of GMAC Real Estate shall be required with respect to any Transfer of an ownership interest equal to or greater than 10% of the total ownership interests in Strategic-Partner (including Transfers which, over the Term of this Agreement, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a Transfer of 10% or more of the ownership interests). GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption of Strategic-Partner's obligations under this Agreement provided, however that any Transfer between/among the spouse and/or children of an Owner shall not be unreasonably withheld so long as Robert Garrow maintains at least 51% ownership in Strategic-Partner. Whether or not GMAC Real Estate's consent is required, Strategic-Partner shall provide at least 60 days prior written notice to GMAC Real Estate of any Transfer of ownership interests in Strategic-Partner (but, in the case of a Transfer upon the death of an Owner, within 30 days after the date of such death). If GMAC Real Estate's consent is required, then within 60 days of its receipt of the notification, GMAC Real Estate shall notify Strategic-Partner or transferee of its consent or refusal to consent to the proposed Transfer.

E. **Definition of a Transfer**. For purposes of Sections 17.B. and 17.D., the term "Transfer" shall mean any sale, lease, assignment, conveyance or other transfer including:

(i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those occurring between/among the spouse and/or children of an Owner; and (iii) those occurring through any other voluntary act.

F.  **Effect of Unauthorized Transfer.**  A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

G.  **Right of First Refusal.**  As to any Transfer referenced in 17.B. or 17.D. above (except a Transfer of ownership interests between/among the spouse and/or children of an Owner or between/among Owners), GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**").  Prior to a Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the term sheet, letter of intent or contract (the "**Offer Document**") whereby Strategic-Partner has agreed with a third-party to a Transfer, together with a certification from the transferor(s) that the Offer Document accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Offer Document (the Offer Document, the certification and the due diligence materials are sometimes hereinafter referred to, collectively, as the "**Offer Package**").  If, within 10 days of receipt by GMAC Real Estate of the Offer Package (the "**10-day Notice Period**"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into a contract based on the same terms set forth in the Offer Document and, thereafter, each party shall be bound by its terms, provided the Offer Document provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Offer Document; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to, those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities.  If, within the 10-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 10-day Notice Period (the "**180-day Waiver Period**").  If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Offer Document, the Right of First Refusal shall be considered terminated.  If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Offer Document or any material term or condition of the Offer Document is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Offer Document that was changed during any 180-day Waiver Period).

## 18. TERMINATION; DEFAULT; CROSS-DEFAULT.

This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

A. **By Strategic-Partner**. If GMAC Real Estate is in Default (as defined in Section D. below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the "**Strategic-Partner's Termination Notice**"), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the "**Strategic-Partner's Default Notice**") which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site(s) and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site(s), and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

B. **By GMAC Real Estate (Automatic)**. Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

(1)     Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final, non-appealable judgment in an amount of $50,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

(2)    With regard to any of the Licensed Site(s), Strategic-Partner ceases to operate its real estate brokerage business under the Marks or ceases operations generally, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if any of the Licensed Site(s) is damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from GMAC Real Estate to relocate or reconstruct such Licensed Site, which approval shall not be unreasonably withheld, delayed or conditioned. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(3)    The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located is otherwise forfeited. Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

(4)    Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation. Without limiting the generality of the foregoing, any breach of the representations or warranties set forth in Section 20.C. hereof shall result in automatic termination of this Agreement. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(5)    Strategic-Partner or any Owner purports to Transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

(6)    Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7)    Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

C. **By GMAC Real Estate (Right To Cure)**. If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in Section 18.B., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the "**GMAC Real Estate Termination Notice**"), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written

notice of such Default (the "**GMAC Real Estate Default Notice**") which specified the nature and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice.

D. **Default and Event of Default.**    The term "**Default**", as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement.    The term "**Event of Default**", as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

E. **Additional Remedies upon an Event of Default.**    Should Strategic-Partner commit an Event of Default, GMAC Real Estate, without terminating this Agreement, may, at its option, (and in addition to any other remedies available to it under this Agreement), suspend services to Strategic-Partner, remove Strategic-Partner from any GMAC Real Estate websites and other directories, eliminate Strategic-Partner's exclusive territory (if any) under this Agreement, suspend further referrals to Strategic-Partner and remove Strategic-Partner from the authorized referral directory, or take other action deemed appropriate.

F. **Cross-Default.**    Notwithstanding any contrary provision of this Agreement or any other Franchise Agreement between Strategic-Partner (and/or its Owners or affiliates) and GMAC Real Estate (each such other Franchise Agreement being a "**Sister Agreement**"), any occurrence of Strategic-Partner's Default and/or Event of Default under this Agreement shall constitute a Default and/or Event of Default under each Sister Agreement, and any occurrence of Strategic-Partner's Default and/or Event of Default under any Sister Agreement shall constitute a Default and/or Event of Default under this Agreement.

## 19. OBLIGATIONS UPON TERMINATION.

A.  Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

(1)    within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate.    Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the Marks.    In addition, if Strategic-Partner has used the words "GMAC Real Estate" as part of its internet domain name and such use has not terminated within 10 days of termination of this Agreement, Strategic-Partner will be deemed to have assigned its rights in such domain name to GMAC Real Estate, and GMAC Real Estate may take whatever actions it deems appropriate to terminate such domain name and Strategic-Partner's right to use the same;

(2)    on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

(a)    Royalty Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to transactions under contract on or before the date of termination that settle

or close within sixty (60) days after the date of termination (collectively, "**Pendings**") (on the termination date, Strategic-Partner agrees to provide GMAC Real Estate with a complete and detailed list of all such Pendings); and

      (b)    Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

      (3)    Cease to use all Confidential Materials and all signs and documentation bearing the Marks (including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like) and surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all such Confidential Materials and signs and documentation. Strategic-Partner shall continue to be bound by its confidentiality obligations under this Agreement. GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise or from breaching its confidentiality obligations under this Agreement;

      (4)    Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks, provided, however that so long as Strategic-Partner can provide documentation to GMAC Real Estate that such Yellow Pages advertising has been cancelled, GMAC Real Estate shall not attempt to collect fees in accordance with subsection C. below for any advertising that extends into the first six (6) months following the date of termination;

      (5)    Execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site;

      (6)    For a period of one year following the date of termination, refrain from soliciting, directly or indirectly, referrals from any GMAC Real Estate strategic-partners; and

      (7)    Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to evidence the fact that Strategic-Partner has ceased using the Marks and Confidential Materials and has no further right to use the Marks or Confidential Materials.

B. Upon termination of this Agreement pursuant to Section 18.B. or 18.C. above, in addition to the obligations set forth in Section 19.A. above:

      (1)    Strategic-Partner shall:

      (a)    pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

      (b)    remain obligated with respect to the provisions of Section 8 of this Agreement; and

(2)    Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

For purposes of section 19B(2), the "losses attributable to the one-year period after the date of termination" shall be calculated by taking the total Royalty and Advertising Fees owed by Strategic-Partner, as provided in Exhibit A of this Agreement, in the twenty-four (24) month period immediately preceding the date of termination, dividing that number by twenty-four (24), and then multiplying that number by twelve.

C. If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20. REPRESENTATIONS AND WARRANTIES.

A. Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in each state in which the Licensed Site(s) is/are located) licensed to sell real estate in each state in which the Licensed Site(s) is/are located.

B. Strategic-Partner acknowledges that:

(1)    GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the Offering Circular concerning this franchise for each state in which the Licensed Site(s) is/are located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review.

(2)    GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry.

(3)    Neither GMAC Real Estate nor any person acting on its behalf has made any oral or written representation or promise to Strategic-Partner that is not written in this Agreement on which Strategic-Partner is relying to enter into this Agreement. Strategic-Partner releases any claim against GMAC Real Estate or its agents based on any oral or written representation or promise not stated in this Agreement.

(4)    There are no express or implied covenants or warranties, oral or written, between GMAC Real Estate and Strategic-Partner, except as expressly stated in this Agreement.

C.  Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures").  GMAC Real Estate therefore requires certain representations and warranties that the parties with whom it deals are not directly or indirectly involved in terrorism.  Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

      (i)     a person or entity listed in the Annex to the Executive Order; or

      (ii)     a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

      (iii)     a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

      (iv)     owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in clauses (i) – (iv) above.

## 21. ENTIRE AGREEMENT.

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

## 22. INDEMNIFICATION AND INSURANCE.

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate and its corporate parents and affiliates, and their respective directors, officers, agents and employees, (collectively, the "**Indemnitees**"), from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business.  This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain:  (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations.  For the insurance

referenced under clauses (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in clause (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate and the other Indemnitees (as defined above) shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of each state in which the Licensed Site(s) is/are located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

Notwithstanding anything in the above to the contrary, in lieu of errors and omissions insurance, Strategic-Partner shall be permitted to maintain a self insured legal defense fund ("**Legal Defense Fund**") with respect to Strategic-Partner's real estate brokerage operations, provided that the following conditions with respect to said Legal Defense Fund are met to the satisfaction of GMAC Real Estate:

    a) A copy of the provisions governing Strategic-Partner's Legal Defense Fund Program (the "Program Guidelines") is provided to GMAC Real Estate as of the Effective Date. The Program Guidelines must specifically provide that the funds in the Legal Defense Fund may be used to satisfy any and all indemnification obligations owed to GMAC Real Estate and the other Indemnitees arising in connection with errors and omissions-related claims. The Program Guidelines may not be amended without the prior written consent of GMAC Real Estate; and

    b) All contributions to the Legal Defense Fund are placed in a Legal Defense Fund account (the "Fund Account") which is maintained separately from Strategic-Partner's other accounts. Furthermore, beginning on the first anniversary of the Effective Date, a minimum balance of $1,000,000 must be maintained at all times in the Fund Account. Strategic-Partner shall provide quarterly certifications of such Fund Account balance to GMAC Real Estate together with a copy of a Statement of Account; and

    c) Notwithstanding any of the above, Robert Garrow, throughout the term of this Agreement, personally guarantees Strategic-Partner's obligation to indemnify GMAC Real Estate and the other Indemnitees with regard to errors and omissions-related claims.

## 23. CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.

A. **Choice of Law.** Except as expressly provided otherwise, this Agreement shall be construed in accordance with the laws of the state in which the Licensed Site(s) is/are located. If the Licensed Sites are located in more than one state, this Agreement shall be construed in accordance with the laws of the state in which Strategic-Partner's principal administrative office is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Section. All disputes regarding the validity of the arbitration agreement set forth in Section 23.B shall be governed by the laws of the State of Illinois, without regard for its conflict of laws principles.

B. **Arbitration.** GMAC Real Estate and Strategic-Partner agree that, except for controversies, disputes or claims (together or separately, "**Claims**") related to the improper use of the Marks, all Claims between GMAC Real Estate and its affiliates (and their respective shareholders, officers, directors, agents, and/or employees)(together, the "**GMAC Real Estate Parties**"), and Strategic-Partner (and/or Strategic-Partner's Owners, guarantors, affiliates, and/or employees)(together, the "**Strategic-Partner Parties**") arising out of or related to:

(1)    this Agreement or any other agreement between Strategic-Partner and GMAC Real Estate;

(2)    GMAC Real Estate's relationship with Strategic-Partner; or

(3)    any policy or standard relating to the Franchise or the franchised business;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association ("**AAA**"). The arbitration proceedings will be conducted by one arbitrator and, except as this section otherwise provides, according to the then current commercial arbitration rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator and will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided by federal statute, award any punitive or exemplary damages against either party (GMAC Real Estate and Strategic-Partner waive, to the fullest extent permitted by law, except as expressly provided by federal statute, any right to, or claim for, punitive or exemplary damages against the other). The arbitrator shall be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. Each party shall be required to submit all Claims against the other or those Claims shall be forever waived. The arbitrator may not consider any settlement discussions that might have been made by either Strategic-Partner or GMAC Real Estate.

GMAC Real Estate and Strategic-Partner agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between any of the GMAC

Real Estate Parties and any of the Strategic-Partner Parties may not be consolidated with any other arbitration proceeding between GMAC Real Estate and any other person or between Strategic-Partner and any other person.

Despite GMAC Real Estate's and Strategic-Partner's agreement to arbitrate, GMAC Real Estate and Strategic-Partner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that GMAC Real Estate and Strategic-Partner must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

C. **Waiver of Jury Trial.** **To the extent permitted by law, Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.**

D. **Time Limitations for Claims.** Any claim by Strategic-Partner or GMAC Real Estate (each a "Claiming Party") against the other shall be barred unless, within one year from the date that the Claiming Party knew, or should have known, of the facts upon which the claim is based, the Claiming Party filed a formal request for arbitration against the other party, as set forth above.

## 24. MODIFICATION OF AGREEMENT.

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

## 25. SEVERABILITY.

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

## 26. NON-WAIVER.

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

## 27. NOTICES; FACSIMILE AND ELECTRONIC MAIL.

A. Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served:  (a) by personal delivery (which shall be effective upon such personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

B. Although not effective for purposes of giving notice pursuant to Section 27.A. above, each party consents to the other party forwarding facsimile and electronic mail transmissions to the consenting party as follows:

GMAC Real Estate:

To: Contract Administration @ (866) 926-1640 (fax) and susan_daniel@gmachs.com (e-mail)

Strategic Partner:

To: Robert Garrow@ (810) 695-1822 (fax) and rgarrow@garrowgmac.com (e-mail)

Such consent will continue in effect until modified or terminated by written notice to the other party sent in accordance with subparagraph 27.a. above.

## 28. TERM AND RENEWAL.

The term of this Agreement shall be ten (10) years from the Effective Date (as later defined) (the **"Term"**).

At the expiration of the Term, Strategic-Partner shall have the right to enter into a new, five-year agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement at least 180 days prior to the expiration of the Term, and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option,

GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and the Royalty Fees shall be an amount equal to 10% of Strategic-Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission, or, if Strategic-Partner has been paying Royalty Fees based on a flat fee per agent schedule, the Royalty Fees shall be paid at twice the then-current rate. Subject to any contrary applicable state law, GMAC Real Estate also shall have the option to serve Strategic-Partner with a notice of termination, such termination to be effective 30 days following the date Strategic-Partner is served with the notice of termination, unless GMAC Real Estate indicates a later date in such notice.

## 29. EFFECTIVE DATE.

The parties intend that this Agreement be effective as of June 1, 2006 (the "**Effective Date**"). If, prior to the Effective Date, Strategic-Partner identifies the Licensed Site as a GMAC Real Estate office or operates the Licensed Site under the Marks without GMAC Real Estate's express written consent, then, in addition to GMAC Real Estate's other remedies under this Agreement, Strategic-Partner will be obligated to pay all fees under Section 10 beginning on the date that such identification or operation under the Marks actually commenced. The Effective Date is conditioned upon:

    A.  Receipt by GMAC Real Estate of the declaration pages for all insurance policies secured by Company as required under Section 22 of the Franchise Agreement. GMAC Real Estate must be named as an additional insured under all of the insurance policies; and

    B.  Strategic-Partner having paid to GMAC Real Estate $122,726 which represents a portion of the past due fees due to GMAC Real Estate through December, 2005 pursuant to the Service Contract (as defined below); and

    C.  Strategic-Partner being current in all fees due to GMAC Real Estate under the Service Contract for the period from January 1, 2006 through the Effective Date of this Agreement, subject to the provisions of Section 30 below.

Strategic-Partner will use its best efforts to satisfy the foregoing condition on or before the Effective Date. If the foregoing condition is not satisfied by the Effective Date, or if GMAC Real Estate has not waived the condition in writing, then GMAC Real Estate, at its sole option, may agree to amend the Effective Date to a later date or may terminate this Agreement by sending written notice of termination to Strategic-Partner. In the event of termination pursuant to this Section, the Joining Fee or any other amounts paid to GMAC Real Estate by Strategic-Partner, shall in no circumstance be refunded.

## 30. PAST DUE FEES/FRANCHISE DEVELOPMENT COSTS LOAN.

A.  Strategic-Partner acknowledges that Strategic-Partner owes to GMAC Real Estate certain Franchise Fees, audit expenses, interest, late charges and other fees (collectively, the "**Past Due Fees**") pursuant to the Service Contract (as defined in Section 31(b), below). GMAC Real Estate and Strategic-Partner agree that, as of December, 2005, the outstanding amount of Past Due Fees (as offset by a LASP credit of $40,325.04) is $295,280.92. Subject to Strategic-

Partner satisfying all conditions to the effectiveness of this Agreement pursuant to Section 29 above, GMAC Real Estate agrees that repayment of the Past Due Fees is hereby restructured as follows:

> (i)  Payment of $122,726 will be made simultaneously with Effective Date, pursuant to Section 29.B.; and

> (ii) An additional $122,726 will be repaid in accordance with the terms of a Term Loan Note (the "**Term Loan Note**"), the form of which is attached as Exhibit C, which Strategic-Partner shall execute and deliver to GMAC Real Estate simultaneously with Strategic-Partner's execution of this Agreement, along with all other Loan Documents described in subsection C. below, ; and

> (iii) Provided that the foregoing conditions are met, Strategic-Partner repays all amounts due in accordance with the terms of the Franchise Development Costs Note (defined below) and the Term Loan Note, and provided that Strategic-Partner has not committed an Event of Default under this Agreement, the remaining $49,829.92, representing audit costs, accrued interest and late charges on the Past Due Fees will be forgiven.

B.  In recognition of expenses that will be incurred by Strategic-Partner relative to its entering into this Agreement and in order to encourage Strategic-Partner to actively pursue the expansion of its influence in its market area, GMAC Real Estate will loan to Strategic-Partner the sum of $320,000 (the "**Franchise Development Costs Loan**"), subject, however, to Strategic-Partner satisfying all conditions to the effectiveness of this Agreement pursuant to Section 29 above, Strategic-Partner's execution of the Term Loan Note as provided in subsection A. above, and Strategic-Partner's execution of and delivery of a Franchise Development Costs Note (the "**Franchise Development Costs Note**"), the form of which is attached as Exhibit B; and

C.  Simultaneously with the execution of the Franchise Development Costs Note and the Term Loan Note, Strategic-Partner will execute and deliver, or cause to be executed and delivered, all other documentation required by GMAC Real Estate, including a Loan and Security Agreement in the form attached hereto as Exhibit D, a Personal Guaranty in the form attached hereto as Exhibit E and a Pledge Agreement in the form attached hereto as Exhibit F. All such other documents, together with the Franchise Development Costs Note and the Term Loan Note are sometimes hereinafter referred to, collectively, as the "**Loan Documents**"; and

D.  Notwithstanding anything in this Agreement or any of the Loan Documents to the contrary, and in addition to any other remedies which may be available to GMAC Real Estate, in the event that Strategic-Partner fails to make any payments required under this Agreement or the Loan Documents when due, and such delinquency continues for a period of forty-five (45) days after the applicable due date, then all amounts due under the Loan Documents will automatically accelerate and become immediately due and payable, without the necessity of giving notice to Strategic-Partner.

## 31.  LIMITATION OF DAMAGES/RELEASE.

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

Strategic-Partner's predecessor-in-interest, Garrow-Loftis, Inc. ("GL") was a party to one or more prior franchise agreements with GMAC Real Estate, GMAC Home Services, Inc. and/or Meredith Corporation (together, the "Prior Franchisors"), including, without limitation, the Real Estate Service Contract dated September 1, 1998  between Garrow-Loftis, Inc. and GMAC Home Services, Inc., as amended from time to time (the "Service Contract"). Simultaneously herewith, GL assigned to Strategic-Partner and Strategic-Partner assumed, all of GL's rights and obligations under the Service Contract.  Strategic-Partner releases and discharges the Prior Franchisors from all claims in any way related to or arising from any prior franchise agreement, including, without limitation, the Service Contract.

## 32.  CONFIDENTIALITY OF AGREEMENT.

Except as may be required by law, Strategic-Partner agrees not to publicize or disclose to any third party, without the prior written consent of GMAC Real Estate, the terms of this Agreement or any other agreements entered between Strategic-Partner and GMAC Real Estate or either of their respective Affiliates in furtherance of this Agreement.

**[The remainder of this page has been intentionally left blank.]**

IN WITNESS WHEREOF, the parties have executed this Agreement.

**GMAC REAL ESTATE, LLC**

By: _____

Print Name: <u>Susan Daniel</u>

Title: <u>Assistant Vice President</u>

Date: <u>6/20/06</u>

**GARROW REAL ESTATE, LLC**

By: _____

Print Name: <u>Robert Garrow</u>

Title: <u>President</u>

Date: <u>6-16-06</u>

## ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.C. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment; Ownership; Transfers; Right of First Refusal), 18.F. (Cross-Default), 19.B. (Financial Obligations after Default) 22 (c) (Legal Defense Fund in lieu of E&O insurance) and 23 (Choice of Law and Forum; Arbitration; Waiver of Jury Trial; Time Limitation for Claims).

_____     Date: _6-16-06_
Robert Garrow

<u>Exhibit A to the Franchise Agreement</u>
<u>Royalty and Advertising Fees</u>

a.      **Royalty Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Royalty Fees, in accordance with the following:

(1)     <u>Amount</u>. Subject to the terms of the paragraph which follows below, on the 5th day of each calendar month, for each full or partial preceding calendar month covered by this Agreement, a Royalty Fee, in an amount equal to a percentage of the GCI to which Strategic-Partner is entitled from transactions that closed or settled during such preceding calendar month, based on the following:

1.50% beginning on June 1, 2006
2.00% beginning on June 1, 2007
2.25% beginning on June 1, 2008
2.50% beginning on June 1, 2009
2.625% beginning on June 1, 2010
2.75% beginning on June 1, 2011
2.875% beginning on June 1, 2012
3.00% beginning on June 1, 2013 and continuing through the end of the Term of this Agreement

In addition, beginning on June 1, 2007, if at the end of each twelve-month period thereafter during the Term of this Agreement (each, a "**Measurement Period**"), the total amount of Royalty Fees paid by Strategic-Partner during such Measurement Period ("**Actual Annual Fees**") is less than $75,000 (the "Annual Royalty Fee Minimum"), Strategic-Partner shall pay to GMAC Real Estate an amount equal to the difference between the Annual Royalty Fee Minimum and the Actual Annual Fees.

Notwithstanding the monthly payment schedule described above, in the event GMAC Real Estate requires Strategic-Partner to use a BRS and/or EFT in accordance with Section 11.B. of this Agreement, then Royalty Fees will be due upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI.

As to transactions under contract or in escrow on the date of the termination of this Agreement, Strategic-Partner shall be required to pay those Royalty Fees which are based on GCI earned with respect to such transactions that settle or close within sixty (60) days after the date of termination.

b.      **Advertising Fees.**

Subject to the terms of the paragraph which follows immediately below, on the 5th day of each calendar month, for each full or partial preceding calendar month covered by this Agreement , Strategic-Partner shall pay to GMAC Real Estate an Advertising Fee, in an amount equal to 2% of the GCI to which Strategic-Partner is entitled from transactions that closed or settled during such preceding calendar month,  provided, however, the amount of the Advertising Fee in any calendar-

month:  (i) shall not exceed $893 per Licensed Site for that calendar-month; and (ii) shall not be lower than $246 per Licensed Site for that calendar-month regardless of transaction count (if this minimum amount has not been received by GMAC Real Estate during any month through payments based on a percentage of GCI for that calendar-month, the difference between this minimum amount and the payments actually received by GMAC Real Estate shall be paid by Strategic-Partner on the first business day after the last day of each calendar-month).

Notwithstanding the monthly payment schedule described above, in the event GMAC Real Estate requires Strategic-Partner to use a BRS and/or EFT in accordance with Section 11.B. of this Agreement, then Advertising Fees will be due upon the closing, settlement or close of escrow of each transaction from which Strategic-Partner is entitled to be paid GCI.

GCI generated by a sales agent shall be attributed to the Licensed Site at which the sales agent's license is held or registered or, if the applicable state's licensing regulations do not provide for the holding or registration of sales agents' licenses at particular office locations, at the Licensed Site from which the sales agent principally operates.

Minimum and maximum Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Advertising Fees in any year be greater than 5%).  The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

08CV3141    DAJ
JUDGE LEINENWEBER
MAGISTRATE JUDGE NOLAN

# EXHIBIT B

### AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| GMAC REAL ESTATE, LLC, | ) |
| Complainant, | ) |
| | ) |
| v. | )     No: |
| | ) |
| GARROW REAL ESTATE, LLC d/b/a | ) |
| GARROW GMAC REAL ESTATE, | ) |
| and ROBERT GARROW, | ) |
| | ) |
| Respondents. | ) |

### DEMAND FOR ARBITRATION

Complainant, GMAC Real Estate, LLC ("GMACRE"), by its attorneys, Williams Montgomery & John Ltd. for its Demand against Respondents, Garrow Real Estate, LLC d/b/a Garrow GMAC Real Estate ("Garrow LLC") and Robert Garrow ("Garrow"), alleges as follows:

### Parties

1.      GMACRE is a limited liability company organized and existing under the laws of the State of Delaware having its principal place of business in the State of Illinois. GMACRE is engaged in the business of granting to others ("franchisees") the right to operate residential real estate brokerage offices using various trade and service marks, including the mark "GMAC® Real Estate" (the "GMAC Marks").

2.      Upon information and belief, Garrow is a resident and citizen of the State of Michigan.  Garrow is a former franchisees of GMACRE.

3.      Upon information and belief, Garrow LLC is a limited liability corporation organized and existing under the laws of the State of Michigan.  Garrow LLC is a former franchisee of GMACRE.



4.    This is an action for breach of contract, trademark infringement, false designation as to origin, and trademark dilution under the Federal Trademark (Lanham) Act, 60 Stat. 427, 15 U.S.C. § 1051 *et seq.,* common law trademark infringement, unfair competition, and deceptive trade practices under the statutes and common law.

5.    For many years prior to the acts complained of herein, GMAC has been continuously engaged in the business of operating a real estate franchise system.

### Facts Common To All Counts

### The Parties' Written Real Estate Service Contract

6.    On or about June 1, 2006, Garrow LLC entered into a new written GMAC Real Estate, LLC Real Estate Franchise Agreements (collectively "Franchise Agreement") with GMACRE pursuant to which GMACRE granted Garrow LLC the right to operate numerous residential real estate franchise offices in Michigan.  A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A.

7.    Under the Franchise Agreement, Garrow LLC received, among other things, a limited license to use the GMAC Real Estate Marks in connection with the operation of that office. (See Section 3 of the Franchise Agreement.)  The term of the Franchise Agreement was ten (10) years.

8.    Under the Franchise Agreement, Garrow LLC agreed, among other things, to pay to GMACRE certain fees, including Royalty Fees, Referral Fees, Referral Office Fees, and Advertising Fees. (See Ex. A, Section 8.)  The Royalty Fees, which were due and payable on a monthly basis, were computed as a percentage of the commissions and fees income Garrow LLC generated from the sale of residential real property at each location. Garrow LLC also

agreed to pay GMACRE a monthly Advertising Fee computed as a percentage of the commissions and fees income collected.

9.    Under Section 18 of the Franchise Agreement, it is an event of default, and grounds for termination of the Franchise Agreement, if Garrow LLC failed to comply with its payment obligations and failed to cure that breach within 30 days after their receipt of notice of breach.   Under Section 18(f) Cross-Default, a Default of any Garrow LLC Franchise Agreement constitutes a Default for every Garrow LLC location.

10.    Under Paragraph 23 of the Franchise Agreement any dispute with respect to the Agreement "must be submitted for arbitration . . . to the American Arbitration Association (AAA)."  All arbitrations are to be conducted in accordance with AAA's current commercial arbitration rules.

### Garrow LLC's Failure to Pay GMACRE

### the Amounts Due Under the Franchise Agreement

11.    By letter dated September 20, 2007, GMACRE advised Garrow LLC that it was in default of its obligations under the Franchise Agreement for failing to make payments required under the Franchise Agreement. The September 20, 2007 letter advised Garrow LLC that if it failed to fully cure each default within 30 days of the date of the letter, the Franchise Agreement could be terminated.  A true and correct copy of the September 20, 2007 letter will be supplemented as as Exhibit B.

12.    Garrow LLC did not cure the default referenced in the September 20, 2007 letter.

13.    Accordingly, on October 22, 2007, GMACRE sent Garrow LLC a Notice of Termination advising them that the Franchise Agreement was terminated. A true and correct copy of the October 22, 2007 Notice of Termination is attached hereto as Exhibit C.   The

October 22, 2007 Notice reminded Garrow LLC and Garrow of their post-termination obligations under the Franchise Agreement, including their obligation to pay to GMACRE all fees, charges and other amounts due to GMACRE, as well as all losses sustained by GMACRE as a result of the early termination of the Franchise Agreement. The Notice also advised Garrow LLC that within 10 days it must cease the use of the GMAC Real Estate Mark.

14.    Garrow LLC and Garrow have failed and refused to pay these outstanding amounts to GMACRE, the sum of which is at least $2,386,435 remains due and owing to GMACRE.

15.    Under the Franchise Agreement, Garrow LLC agreed to reimburse GMACRE for all of the costs it incurred, including reasonable attorneys' fees, in enforcing their post--termination payment obligations.

16.    Garrow also executed an Endorsement of Principals agreeing to be personally bound by the provisions of the Franchise Agreement relating to, among others, and financial obligations and use of the marks after default.

17.    Subsequent to the termination of the Franchise Agreement and for a considerable time thereafter including, on information and belief, through the filing of this arbitration Garrow LLC continued to use the GMAC Real Estate Marks and logo in their advertising, website, and sales in direct violation of Section 19 of the Franchise Agreement.

18.    GMACRE has fully performed its obligations under the Franchise Agreement.

### The Parties' Written Franchise Development Costs Note

19.    On or about June 1, 2006, Garrow LLC entered into a written Franchise Development Costs Note (the "Note") with GMACRE in the amount of $320,000.00. A

4

true and correct copy of the Franchise Development Note is attached hereto and made a part hereof as Exhibit D.

20.    On or about June 16, 2006, Garrow executed a Personal Guaranty of Note, unconditionally guarantying the payment of the Note to GMAC.  A true and correct copy of the Personal Guaranty of Note is attached hereto as Exhibit E.

21.    As of the date of termination of the Franchise Agreement solely due to the default of Garrow LLC there remained due and owing on the Note a balance of $309,333.32 which remains unpaid.

### The Term Loan Note

22.    On or about June 1, 2006, Garrow LLC also entered into a written Term Loan Note ("Term Note") with GMACRE in the amount of $122,726.00.  A true and correct copy of the Term Loan Note is attached hereto and made a part hereof as Exhibit F.

23.    On or about June 16, 2006, Garrow executed a Personal Guaranty of Note, unconditionally guarantying the payment of the Term Note to GMACRE.  (See Exhibit E.)

24.    As of the date of the Termination of the Franchise Agreement solely due to the default of Garrow LLC, there remained due and owing on the Term Note a balance of $123,580.72 which remains unpaid.

### Non-Compete Agreement

25.    Pursuant to Section 8 of the Franchise Agreement, Garrow LLC and Garrow as owner of Garrow LLC, agreed to a non-compete provision.

26.    Specifically, Garrow LLC and Garrow agreed that for the Term of the Franchise Agreement they would not directly or indirectly "establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, . . . (b) any real estate brokerage operation or business or real estate information center, . . . or (c) any business offering real estate settlement services and/or products . . ." (See Exhibit A, Section 8.)

27.    To date, Garrow LLC and Garrow continue to directly and indirectly provide and/or have an interest in a real estate brokerage business.

## COUNT I

### (Breach of Contract – Franchise Agreement)

28.    GMACRE realleges and incorporates by reference paragraphs 1 through 27 of its Demand as Paragraph 28, as if fully set forth herein.

29.    Garrow LLC breached the Franchise Agreement by, among other things, failing and refusing to pay Royalty Fees and other fees and charges due GMACRE.

30.    As a direct and proximate result of Garrow LLC's breaches of the Franchise Agreement, GMACRE has suffered damages in an amount in excess of $2,386,435.

WHEREFORE, Complainant prays for an entry of a judgment against Respondents in the amount of $2,386,435 plus all attorneys fees and costs associated with this action plus all pre and post judgment interest.

## COUNT II

### (Breach of Contract Against Garrow LLC - Notes)

31.    GMACRE realleges and incorporates by reference paragraphs 1 through 30 of its Demand as Paragraph 31, as if fully set forth herein.

6

32.    Garrow LLC has breached the Note and Term Note by, among other things, failing and refusing to pay the balance due and owing to GMACRE.

33.    As a direct and proximate result of Garrow LLC's breaches of the Note and Term Note, GMACRE has suffered damages in an amount in excess of $432,913.

WHEREFORE, Complainant prays for an entry of a judgment against Respondents in the amount of $432,914.04 plus all attorneys fees and costs associated with this action plus all pre and post judgment interest.

## COUNT III

**(Breach of Contract Against Garrow – Personal Guaranty)**

34.    GMACRE realleges and incorporates by reference paragraphs 1 through 33 of its Demand as Paragraph 34, as if fully set forth herein.

35.    Garrow has breached the Personal Guaranty of Note by, among other things, failing and refusing to pay the balance due and owing to GMACRE.

36.    As a direct and proximate result of Garrow's breaches of the Note and Garrow's breaches of the Personal Guaranty of Note, GMACRE has suffered damages in an amount in excess of $309,333.

WHEREFORE, Complainant prays for an entry of a judgment against Garrow in the amount of $309,333.32 plus all attorneys fees and costs associated with this action plus all pre and post judgment interest.

## COUNT IV

**(Breach of Contract Against Garrow – Non-Compete)**

37.    GMACRE realleges and incorporates herein by reference paragraphs 1 through 36 of this Demand as if fully set forth herein

7

38.    On information and belief, Garrow breached the Franchise Agreement by, among other things, continuing to directly or indirectly provide real estate brokerage services in violation of Section 8 of the Franchise Agreement.

39.    As a direct and proximate result of Garrow's breaches of the Franchise Agreement, GMACRE has suffered and continues to suffer damages in an amount to be calculated at the arbitration.

WHEREFORE, Complainant prays for an entry of judgment against Respondents as follows:

A.    For an order prohibiting Respondents from directly or indirectly being affiliated with, or having any interest in: (i) any real estate brokerage franchising or similar system or service, other than one operated by Complainant; (ii) any real estate brokerage operation or business or real estate information center, which is not licensed by Complainant; and (iii) any business offering real estate settlement services and/or products for the Term of the Franchise Agreement;

B.    For Complainants costs in this action, including its reasonable attorney's fees, and pre- and post judgment interest.

## COUNT V

### (Federal Trademark Infringement, 15 U.S.C. § 1114)

40.    GMACRE re-alleges and incorporates herein by reference paragraphs 1 through 39 of this Demand as if fully set forth herein.

41.    GMACRE, through it's parent entity, has been and is now the owner of all right, title, interest and good will in and to the trademarks, service marks and logos utilized to identify its services to the public, including but not limited to the "GMAC" service mark and a mark

8

consisting of a logo comprised of a design of two trees and the outline of a house (the "double tree and house logo"), hereinafter referred to as the "Registered Marks." Since at least 1977, GMACRE, including through its predecessors in interest, has continuously used the Registered Marks to identify its services to the public.

42.    From 1977 to the present, GMACRE, both for itself and through its predecessors in interest, has generated substantial revenues from its real estate services and has spent substantial sums in advertising these services using the Registered Marks.

43.    As a result of the extensive advertising of, and substantial revenues generated from, the services identified with the Registered Marks, such marks have become extremely well known to the public and to customers, and are a highly distinctive indication of origin. The Registered Marks further each qualify as distinctive marks under 15 U.S.C. § 1125(c).

44.    The GMAC Real Estate Mark was duly registered with the U.S. Patent and Trademark Office through U.S. Certificate of Registration Number 2612792, issued on August 27, 2002.

45.    The "double tree and house" Mark was duly registered with the U.S. Patent and Trademark Office through U.S. Certificate of Registration 1241435, issued on June 7, 1983.

46.    Upon termination of the Franchise Agreement, all right and license granted to Respondents to use or display the Registered Marks was immediately terminated.

47.    Notwithstanding termination of the Franchise Agreement on October 22, 2007, Respondents each, knowingly and willfully, and with conscious and deliberate disregard of the rights of GMACRE to exclusive control over the Registered Marks, continued to aggressively and openly use and display the Registered Marks in connection with the promotion of the Garrow LLC businesses, to distribute letterhead and business cards bearing the Registered Marks, to use signage

displaying the Registered Marks, to post listings of available real estate opportunities on which the Registered Marks were displayed, and to otherwise identify the Garrow LLC business to the public using the Registered Marks, all despite repeated demands from GMACRE to cease such activity following termination of the Franchise Agreement.

48.　　Upon information and belief, Respondents derived significant profits and other benefits from the unauthorized use of the Registered Marks following termination of the Franchise Agreement.

49.　　As a direct and proximate result of the conduct of Respondents, GMACRE has been damaged and will continue to be damaged in an amount to be determined according to proof.

50.　　The acts of Respondents as stated above were committed willfully and intentionally, such that this an exceptional case under 15 U.S.C. § 1117(a), so as to justify an increase in the damages awarded to GMACRE by three times the initial amount, plus an award of attorneys fees and costs incurred in pursuing this action.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.　　For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following October 22, 2007;

B.　　For treble damages on account of Respondents' intentional and willful trademark infringement pursuant to 15 U.S.C. § 1117(a);

C.　　For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT VI

### (Federal False Designation of Origin/False Impression of Association, 15 U.S.C. § 1125)

51.    GMACRE re-alleges and incorporates herein by reference paragraphs 1 through 50 of this Demand as if fully set forth herein.

52.    Respondents' unauthorized use of the Registered Marks in connection with the offering and provision of real estate services is a false designation of origin and a false or misleading representation of fact which is likely to cause confusion, or to cause mistake, or to deceive as to an affiliation, connection or association between GMACRE and Respondents, and is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of Respondents' services by GMACRE or conversely, GMACRE services by Respondents, all in violation of 15 U.S.C. § 1125(a).

53.    As a direct and proximate cause of Respondents' creation of a false impression of association between GMACRE and Respondents, and Respondents' use of a false designation of origin and false or misleading representation of fact in connection with Respondents' services, GMACRE has been damaged and will continue to be damaged in an amount to be determined according to proof.

54.    The acts of Respondents as stated above were committed willfully and intentionally, such that this an exceptional case under 15 U.S.C. § 1117(a), so as to justify an increase in the damages awarded to GMACRE by three times the initial amount, plus an award of attorneys fees and costs incurred in pursuing this action.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.     For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following October 22, 2007;

B.     For treble damages on account of Respondents' intentional and willful trademark infringement pursuant to 15 U.S.C. § 1117(a);

C.     For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT VII

### (Federal Trademark Dilution, 15 U.S.C. § 1125)

55.     GMACRE realleges and incorporates herein by reference paragraphs 1 through 54 of this Demand, as if fully set forth herein.

56.     Respondents' infringing use of the Registered Marks occurred long after the Registered Marks became famous and has caused and will continue to cause dilution of the distinctive quality of the Registered Marks in violation of 15 U.S.C. § 1125(c).

57.     As a direct and proximate result of Respondents' unlawful activities, GMACRE has been damaged and will continue to be damaged by Respondents' dilution of the GMAC Real Estate Mark pursuant to 15 U.S.C. § § 1116(a) and 1125(c), in amounts to be determined according to proof.

58.     The acts of Respondents as stated above were committed willfully and intentionally, such that this an exceptional case under 15 U.S.C. § 1117(a), so as to justify an increase in the damages awarded to GMACRE by three times the initial amount, plus an award of attorneys fees and costs incurred in pursuing this action.

12

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.      For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following October 22, 2007;

B.      For treble damages on account of Respondents' intentional and willful trademark infringement pursuant to 15 U.S.C. § 1117(a);

C.      For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT VIII

### (Common Law Trademark Infringement)

59.     GMACRE realleges and incorporates herein by reference paragraphs 1 through 58 of this Demand, as if fully set forth herein.

60.     Respondents' infringing use of the Registered Marks has caused confusion, mistake and/or deception and caused the public to believe that the services offered by Respondents are the same as those of GMACRE, or that such services were authorized, endorsed, sponsored or approved by GMACRE, or that Respondents were or is connected or associated with GMACRE.

61.     Respondents' infringing use of the Registered Marks constitutes willful and deliberate infringement of GMACRE common-law service mark.

62.     As a direct and proximate result of Respondents' unlawful activities, GMACRE has been damaged and will continue to be damaged in amounts to be determined according to proof.

13

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.    For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondent from business conducted through use of the Registered Marks following October 22, 2007;

B.    For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT IX

### (Deceptive Trade Practices)

63.    GMACRE realleges and incorporates herein by reference paragraphs 1 through 62 of this Demand, as if fully set forth herein.

64.    The acts of Respondents constitute unlawful and deceptive trade practices, in that Respondents knowingly made false representations as to affiliation, connection or association with GMACRE, in violation of the Michigan Consumer Protection Act.

65.    As a direct and proximate result of Respondents' unlawful activities, GMACRE has been damaged and will continue to be damaged in amounts to be determined according to proof.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.    For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondent from business conducted through use of the Registered Marks following October 22, 2007;

B.    For damages in the amount of $250.00 per violation;

14

C.      For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT X

### (Breach of Contract – Franchise Agreement, Use of Marks)

66.      GMACRE realleges and incorporates herein by reference paragraphs 1 through 65 of this Demand, as if fully set forth herein.

67.      At all times mentioned, GMACRE performed and honored all obligations and conditions required of it under the Franchise Agreement and was and is entitled to the full benefit of performance by Respondents.

68.      Respondents have breached the Franchise Agreement by, among other things, failing to cease use of the Registered Marks, and failing to provide reports of business activity for the period prior to the termination of the contract.

69.      As a direct and proximate result of the Respondents' breach, GMACRE has been damaged in amounts to be determined according to proof.

70.      GMACRE is entitled to all attorneys fees and costs incurred in connection with this action pursuant to the written terms of the Franchise Agreement.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.      For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following October 22, 2007;

B.      For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

## COUNT XI

### (Accounting)

71.     GMACRE realleges and incorporates herein by reference paragraphs 1 through 70 of this Demand, as if fully set forth herein.

72.     GMACRE is entitled to an accounting from Respondents for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports, plus the period following termination of the Contract through the period during which Respondents were continuing to use the Registered Marks, pursuant to Section 13 of the Franchise Agreement.

WHEREFORE, Complainant prays for entry of a judgment against Respondents as follows:

A.     For an accounting for all activity conducted by the business for the period prior to termination for which Respondents failed to furnish required reports, plus the period following termination of the Contract through the period during which Respondents were continuing to use the Registered Marks.

B.     For Complainant's actual damages for trademark infringement, including but not limited to all profits realized by Respondents from business conducted through use of the Registered Marks following October 22, 2007;

C.     For Complainant's costs in this action, including its reasonable attorneys fees, plus pre- and post judgment interest.

Respectfully submitted,

By:  Eric R. Lifvendahl
One of the Attorneys for Plaintiff

16

Thomas F. Falkenberg
Eric R. Lifvendahl
Williams Montgomery & John Ltd.
20 North Wacker Drive
Suite 2100
Chicago, IL 60606
(312) 442-3200

Document #: 757000

08CV3141   DAJ
JUDGE LEINENWEBER
MAGISTRATE JUDGE NOLAN

# EXHIBIT C

**AMERICAN ARBITRATION ASSOCIATION**
**Chicago, Illinois**

**COMMERCIAL ARBITRATION PANEL**

---

In the Matter of the Arbitration Between

GMAC REAL ESTATE, LLC

    and

GARROW REAL ESTATE, LLC, now known as
SUMMERLAND REALTY, LLC

Case No. 51 115 Y 01566 07

---

**FINAL AWARD**

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Franchise Agreement entered into by the above-named parties pursuant to that certain Franchise Agreement dated June 20, 2006, and having been duly sworn and having duly heard the proofs and allegations of the Claimant, GMAC Real Estate, LLC and Respondent, Garrow Real Estate, LLC, now known as Summerland Realty, LLC having failed to appear after due notice of hearing by mail in accordance with Commercial Arbitration Rules of the American Arbitration Association ("AAA"), **HEREBY FIND AND AWARD AS FOLLOWS:**

    1.    The hearing proceeded in the absence of Respondent, Garrow Real Estate, LLC now known as Summerland Realty LLC, only on Aprl 11, 2008 at the offices of the Arbitrator, 233 South Wacker Drive, 22nd Floor, Chicago, Illinois.  By virtue of the automatic stay entered in favor of Robert Garrow pursuant to the pending bankruptcy petition filed in his name, no evidence or testimony was taken as to said individual Respondent.  The Award entered herein is based upon the submission of evidence by claimant to the arbitrator pursuant to Rule 29 of the Commercial Arbitration Rules of the AAA.

    2.    The following documents were received and admitted into evidence at the hearing:

    (a)    Exhibit A – Real Estate Franchise Agreement dated June 20, 2006, entered into by and between GMAC Real Estate, LLC and Garrow Real Estate, LLC;

    (b)    Exhibit B – Statement of Account dated September 19, 2007;

    (c)    Exhibit C – Notice of Default dated September 21, 2007 from GMAC Homes Services to Garrow Real Estate, LLC;



EXHIBIT

(d)   Exhibit D – Franchise Development Note in the principal amount of $320,000.00 dated June 1, 2006, executed by Garrow Real Estate, LLC;

(e)   Exhibit E – Personal Guarantee of Note dated June 16, 2006 executed by Robert Garrow, individually;

(f)   Exhibit F – Term Loan Note in the principal amount of $122,726.00 dated June 1, 2006 executed by Garrow Real Estate LLC;

(g)   Exhibit G – Notice of Termination of Franchise dated October 22, 2007, terminating the Franchise Agreement;

(h)   Exhibit H – Member Evaluation Worksheet dated September 19, 2007;

(i)   Exhibit K – Order of Judgment entered in case captioned GMAC Real Estate LLC v. Garrow Real Estate, LLC et al. filed in the United States District Court for the Northern District of Illinois under Case No. 07 C 6803;

(j)   Exhibit J – Certificate of Amendment dated February 27, 2008, issued by the Michigan Department of Labor and Economic Growth Bureau of Commercial Services authorizing the name change of Garrow Real Estate LLC to Summerland Realty, LLC;

(k)   Exhibit I – miscellaneous invoices submitted from the law firm of Williams, Montgomery & John Ltd. for the period 10/19/07 through 2/29/08.

3.    Direct testimony was taken from Mr. Donald Schwer, Senior Credit Analyst for GMAC. Based upon the testimony presented and the documents introduced into evidence, and pursuant to the provisions set forth in Sections19(A)(2)(a) and 19(B)(1)(a) of the Franchise Agreement together with Exhibit A attached thereto and admitted into evidence as Exhibit A, as well as pursuant to the express provisions contained in that certain Franchise Development Note and that certain Term Loan Note executed by Respondent, Garrow Real Estate, LLC and admitted into evidence as Claimant's Exhibits D and F respectively: **I HEREBY AWARD DAMAGES** in favor of the Claimant, GMAC Real Estate, LLC and against Respondent, Garrow Real Estate, LLC now known as Summerland Realty, LLC as follows:

| | | |
|---|---|---|
| i.   | Past Due Transaction and Advertising fees as of 9/19/07 | $   71,246.97 |
| ii.  | Estimated Transaction and Advertising fees for period 2/07-8/07 | $   75,989.38 |
| iii. | Balance due on Development Loan (Ex. D) | $  309,333.32 |
| iv.  | Balance due on Term Note (Ex. F) | $  123,580.72 |
| v.   | Future Transaction and Advertising fees thru end of Franchise term (105 Months) | $1,775,414.91 |
| vi.  | Future lost Referral Fees (105 Months) | $   30,870.00 |
| | **TOTAL** | **$2,386,435.30** |

2

4.     Pursuant to Section 19(C) of the Franchise Agreement, Claimant is entitled to its fees and costs incurred in enforcing its rights under said Agreement, including the payment of reasonable attorneys fees and costs.  Accordingly, **I HEREBY AWARD** the Claimant the sum of $17,580.48 as and for its attorneys fees.

5.     The administrative fees and expenses of the American Arbitration Association totaling $11,250.00 and the compensation and expenses of the arbitrator totaling $3,465.97 shall be borne entirely by Garrow Real Estate, LLC now known as Summerland Realty, LLC. Therefore, Garrow Real Estate, LLC now known as Summerland Realty, LLC shall reimburse GMAC Real Estate, LLC the sum of $14,715.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by GMAC Real Estate, LLC, **upon demonstration by GMAC Real Estate, LLC that these incurred costs have been paid.**

7.     The above sums are to be paid by Respondent on or before 30 days from and after the date of this Final Award.

8.     This Final Award is in full settlement of all claims submitted to this arbitration. All claims not explicitedly granted are hereby denied.

Dated: May 27, 2008

325798

_____
DAVID L. KABAT, Arbitrator

3